UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DEBRA MORRITT and CRAIG MORRITT,

                  Plaintiffs,

      - against -

STRYKER CORPORATION, STRYKER
ORTHOPAEDICS, INC. and STRYKER
HOWMEDICA OSTEONICS, INC., a
division of STRYKER CORPORATION,

                  Defendants.
------------------------------------------------------------X

                                                      **MEMORANDUM & ORDER**
                                                 07-CV-2319 (RRM)(RER)

**MAUSKOPF, United States District Judge.**

      Plaintiffs Debra and Craig Morritt[1] ("plaintiffs") filed this action against Stryker

Corporation, Stryker Orthopaedics, Inc., and Stryker Howmedica Osteonics, a division of Stryker

Corporation, ("defendants") for injuries allegedly caused by a defective knee replacement system

manufactured by defendants.  Defendants removed the action to this Court on the basis of

diversity jurisdiction.  (Notice of Removal (Doc. No. 1).)  Plaintiffs' claims for relief are based

on negligence, strict products liability, breach of implied warranty, breach of express warranty,

and loss of consortium.  (*Id.*)  Defendants move for summary judgment pursuant to Rule 56 of

the Federal Rules of Civil Procedure.  (Doc. No. 33.)  For the reasons set forth below,

defendants' motion is GRANTED in part and DENIED in part.

---

[1] Debra Morritt died intestate on February 11, 2011, while the motion for summary judgment was pending.  (*See* Decl. of Randolph Janis, executed June 1, 2011 (Doc. No. 54) ¶ 2.)  Craig Morritt has moved for an order substituting Craig Morritt, as Administrator of the Estate of Debra Morritt, for Debra Morritt as plaintiff pursuant to Federal Rule of Civil Procedure 25(a)(1).  (*Id.* ¶ 7.)  Craig Morritt was appointed administrator of Debra Morritt's estate for the limited purpose of prosecuting this cause of action by the Richmond County Surrogate's Court on April 28, 2011.  (*Id.* ¶ 4.)  Defendants do not oppose Craig Morritt's motion for substitution.  (*See* Letter of Ronald Blum, dated June 7, 2011 (Doc. No. 55).)  Absent opposition, the Court GRANTS this motion for substitution.  *See Cyrus v. City of N.Y.*, 06-CV-4685 (ARR), 2010 U.S. Dist. LEXIS 2800, at *2 (E.D.N.Y. Jan. 12, 2010).  It is hereby ordered that "Craig Morritt, as Administrator of the Estate of Debra Morritt" be substituted for "Debra Morritt" as one of the plaintiffs in this action and that the Clerk of the Court amend the caption of this case to reflect this substitution.

# BACKGROUND[2]

A.    Debra Morritt's Knee Replacement

On June 16, 2005, Dr. Gregory Montalbano performed a total knee replacement of Debra

Morritt's right knee, using Stryker Scorpio and Series 7000 products.  (Decl. of Debra Morritt,

executed Sept. 8, 2010 ("D. Morritt Decl.") (Doc. No. 38) ¶ 5; Defs.' Mem. in Supp. of Mot. for

Summ. J. (Doc. No. 34) at 5.)  At the time, Debra Morritt was fifty-three years old.  (D. Morritt

Decl. ¶ 6.)  The Stryker Scorpio system is comprised of multiple interlocking pieces

(modularity), allowing a surgeon to mix and match pieces depending on the patient's anatomy.

(Defs.' 56.1 Stmt. (Doc. No. 35) ¶ 5, Pls.' 56.1 Cntrstmt. (Doc. No. 47) ¶ 5.)  Modularity is the

dominant orthopedic trend.  (Defs.' 56.1 Stmt. ¶ 6, Pls.' 56.1 Cntrstmt. ¶ 6.)  In performing

Debra Morritt's knee replacement surgery, Dr. Montalbano used various component parts,

including an Osteonics Scorpio Tibial Bearing Insert – Posteriorly Stabilized 8mm #5, #72-3-

0508, Case Code 91999301, ID #127438P (the "Polyethylene Tibial Insert").  (Decl. of

Randolph Janis, executed Sept. 22, 2010 ("Janis Decl.") (Doc. Nos. 42–46) Ex. 13 (Rep. of Prof.

Robert Rose, executed Jan. 29, 2010 ("Rose Rep.")), at 2; Decl. of Amy T. Sheehan, executed

July 23, 2010 ("Sheehan Decl.") (Doc. No. 36) Ex. A (Rep. of Prof. Steven M. Kurtz, executed

Mar. 1, 2010 ("Kurtz Rep.")), at 2.)

Debra Morritt responded well to the knee replacement until August 2005, when she

complained to Dr. Montalbano of discomfort and swelling in her right knee.  (D. Morritt. Decl. ¶

9.)  On March 15, 2006, Dr. Montalbano examined the knee replacement during arthroscopic

surgery, finding polyethylene wear on the Polyethylene Tibial Insert.  (Decl. of Dr. Gregory

Montalbano, executed Sept. 18, 2010 ("Montalbano Decl.") (Doc. No. 40) ¶¶ 19–21.)  He

---

[2] The following material facts are taken from the Local Rule 56.1 statements submitted by the parties and the affidavits and exhibits submitted in connection with defendants' motion for summary judgment and plaintiffs' opposition thereto.  The facts are undisputed except as noted.

observed "discoloration, cracking, pitting, and erosions" that were "diffuse and not localized."
(*Id.* ¶ 21 (emphasis in original).)  Dr. Montalbano's post-operative diagnosis was "polyethylene
wear, synovitis, and adhesions."  (*Id.* ¶ 20.)  Dr. Montalbano explained to Debra Morritt that "her
persistent symptoms were secondary to this observed premature polyethylene wear" and that "the
subject polyethylene tibial insert had clearly not performed in the manner that it was intended to
in that this tibial insert lasted less than one year while it should have lasted a minimum of 10
years."  (*Id.* ¶ 25 (emphasis in original).)  A Senior Design Engineer for Stryker also testified
that, when the Stryker Scorpio knee replacement system was in the designing stage, its expected
lifetime was a "[m]inimum of 10 years."  (Janis Decl. Ex. 18 (Dec. 22, 2009 Dep. of Marc
Weissman ("Weissman Dep.")) at 23.)

Generally, polyethylene tibial inserts may be damaged by fragments of bone or bone
cement.  (Defs.' 56.1 Stmt. ¶ 12, Pls.' 56.1 Cntrstmt. ¶ 12.)  Malrotation can also cause pitting of
the topside of polyethylene tibial inserts.  (Defs.' 56.1 Stmt. ¶ 13, Pls.' 56.1 Cntrstmt. ¶ 13.)  Dr.
Montalbano stated that he personally reviewed a CAT scan of Debra Morritt's right knee in
March 2006 and determined that the Polyethylene Tibial Insert was properly aligned.
(Montalbano Decl. ¶ 24.)

Dr. Montalbano recommended surgery to remove and replace the allegedly defective
Polyethylene Tibial Insert.  (D. Morritt Decl. ¶ 17.)  On May 3, 2006, Dr. Montalbano replaced
only the Polyethylene Tibial Insert.  (Montalbano Decl. ¶ 9.)  Dr. Montalbano stated that, during
the surgery, he observed that the Polyethylene Tibial Insert was properly aligned.  (*Id.* ¶ 31.)  Dr.
Montalbano chose once again to use the Stryker Scorpio when he removed and replaced the
Polyethylene Tibial Insert.  (Defs.' 56.1 Stmt. ¶ 7, Pls.' 56.1 Cntrstmt. ¶ 7.)  Dr. Montalbano
stated that, after the surgery, he examined the allegedly defective Polyethylene Tibial Insert,

which showed symmetrical macroscopic wear on both sides, delamination, and discoloration of the surface.  (Montalbano Decl. ¶¶ 29–30.)

After the May 3, 2006 surgery, Debra Morritt developed an infection in her right knee. (D. Morritt Decl. ¶ 19.)  One week prior, Debra Morritt had received 700 mg of Remicade, an immunosuppressant, for her arthritis, as prescribed by Dr. Mark Goldstein.  (Defs.' 56.1 Stmt. ¶ 8, Pls.' 56.1 Cntrstmt. ¶ 8; Sheehan Decl. Ex. B (Rep. of Dr. Neil Kramer, executed Feb. 17, 2010 ("Kramer Rep.")), at 2.)  Debra Morritt proceeded to have various additional surgeries and procedures on her right knee, including:

> Irrigation and debridement surgery performed at St. Vincent's Catholic Medical Center on May 19, 2006; Removal of the entire knee replacement system, debridement, and placement of a cement spacer performed at NYU hospital for Joint Diseases on June 16, 2006 – discharged from hospital on June 20, 2006; Removal of cement spacer, debridement, and implantation of new total knee replacement system performed at NYU Hospital for Joint Diseases on July 27, 2006 – discharged from hospital on July 31, 2006; Second irrigation and debridement surgery with poly liner exchange performed at NYU Hospital for Joint Diseases on August 24, 2006 – admitted to hospital on August 23, 2006 and discharged from hospital on August 31, 2006; Revision of total knee replacement system (removal of the system and placement of cement spacer) and third irrigation and debridement surgery performed at NYU Hospital for Joint Diseases on September 28, 2006 – admitted to hospital on September 25, 2006 and discharged on October 2, 2006; and [r]emoval of cement spacer and implementation of new total knee replacement system minus the knee cap performed at NYU Hospital for Joint Diseases on January 12, 2007 – discharged on January 20, 2007.

(D. Morritt Decl. ¶ 19.)  Debra Morritt stated that these surgeries caused her right knee to become weak and her gait to become unsteady.  (D. Morritt Decl. ¶ 20.)

On April 21, 2007, Debra Morritt fell in her kitchen and sustained a fracture of the hip for which she required surgery.  (*Id.*)  She underwent a total hip replacement in April 2007 and subsequently a revision of the hip prosthesis.  (Defs.' 56.1 Stmt. ¶ 9, Pls.' 56.1 Cntrstmt. ¶ 9.)

Following her hip replacement, Debra Morritt developed an infection in her hip.  (Defs.' 56.1 Stmt. ¶ 10, Pls.' 56.1 Cntrstmt. ¶ 10.)

According to a 2009 report conducted in Australia by the Australian Orthopaedic Association National Joint Replacement Registry, the cemented Stryker Scorpio total knee replacement system had a revision rate of 0.9% at 1 year follow-up.  (Defs.' 56.1 Stmt. ¶ 1, Pls.' 56.1 Cntrstmt. ¶ 1.)  The 2003 National Institute of Health Consensus Development Conference established an expected 1% annual revision rate for the category of implants that includes the Stryker Scorpio total knee replacement system.  (Defs.' 56.1 Stmt. ¶ 2, Pls.' 56.1 Cntrstmt. ¶ 2.) Competing knee replacement devices surveyed in the Australian study showed revision rates as high as 2.7% after one year.  (Defs.' 56.1 Stmt. ¶ 3, Pls.' 56.1 Cntrstmt. ¶ 3.)  About 1% of all total knee replacements fail each year for a variety of reasons, including wear of the ultra high molecular weight polyethylene.  (Defs.' 56.1 Stmt. ¶ 4, Pls.' 56.1 Cntrstmt. ¶ 4.)

B.    Procedural Background

Plaintiffs originally filed this action in state court.  On June 8, 2007, defendants removed the case to this Court on the basis of diversity jurisdiction.  (Doc. No. 1.)  By Order of Magistrate Judge Ramon E. Reyes, Jr., fact discovery closed on December 30, 2009, and plaintiffs were ordered to provide expert disclosures by January 29, 2010.  (Doc. No. 23.)  Defendants' rebuttal expert disclosures were due by March 1, 2010, and expert discovery was to be completed by March 26, 2010.  (*Id*.)  Magistrate Judge Reyes' Order required that "[t]he parties further agree and acknowledge that the Court will permit no further modification to the Scheduling Order in this action."  (*Id*.)

During discovery, plaintiffs provided an expert report from only one expert, Professor Robert Rose, a retired engineering professor from the Massachusetts Institute of Technology.

On October 7, 2010, defendants moved for summary judgment.  (Doc. No. 33.)  In opposition to defendants' summary judgment motion, plaintiffs have submitted declarations from Professor Rose and Dr. Montalbano, Debra Morritt's treating physician.  (Montalbano Decl.; Decl. of Prof. Robert Rose, executed Sept. 20, 2010 ("Rose Decl.") (Doc. No. 41).)  Defendants move to strike these declarations pursuant to Federal Rule of Civil Procedure 37, arguing that they contain expert testimony that plaintiffs did not timely disclose as required by Rule 26 and Magistrate Judge Reyes' Scheduling Order.  (Defs.' Rep. in Further Supp. of Summ. J. Mot. (Doc. No. 48) at 2.)  Defendants also seek to preclude the expert testimony of Professor Rose pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). (Defs.' Mem. in Supp. of Mot. for Summ. J. at 20.)  On August 18, 2011, the Court ordered plaintiffs to respond to defendants' motion to strike the Rose and Montalbano declarations.  On August 25, 2011, plaintiffs submitted their opposition to defendants' motion to strike.  (Doc. No. 56.)  On August 29, 2011, defendants filed a letter in further support of their motion to strike. (Doc. No. 57.)

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings, depositions, interrogatories, admissions, and affidavits demonstrate that there are no genuine issues of material fact in dispute and that one party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. R 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a summary judgment motion, a district court must draw all reasonable inferences in favor of the nonmoving party.  *See id.* at 249 (citing *Adickes v. S.H. Kress & Co.*,

398 U.S. 144, 158–59 (1970)); *Castle Rock Entm't, Inc. v. Carol Publ'g Grp., Inc.*, 150 F.3d 132, 137 (2d Cir. 1998). Thus, the court must not "weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2007) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)). Any evidence in the record of any material fact from which an inference could be drawn in favor of the non-moving party precludes summary judgment. *See Castle Rock Entm't*, 150 F.3d at 137.

Once the movant has demonstrated that no genuine issue of material fact exists, such that it is entitled to judgment as a matter of law, then "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original). However, there must exist more than mere "metaphysical doubt as to the material facts" to defeat a summary judgment motion. *Id.* at 586. Instead, the non-moving party must present "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Only disputes over material facts "that might affect the outcome of the suit under the governing law" will properly preclude the entry of summary judgment. *Id.* at 248; *see also Matsushita*, 475 U.S. at 586.

"As a general rule, summary judgment motions are rarely appropriate in products liability cases." *Rupolo v. Oshkosh Truck Corp.*, 05-CV-2978 (SLT), 2009 U.S. Dist. LEXIS 127887, at *15 (E.D.N.Y. Oct. 27, 2009) (citing 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2729.1, at 577 (3d ed. 1998)); *see also Fagan v. Classic Rent a Car, Inc.*, 755 F. Supp. 70, 71 (E.D.N.Y. 1991).

## DISCUSSION

A.   Design Defect

"In order to establish a prima facie case in strict products liability for design defects [under New York law], the plaintiff must show that the manufacturer . . . marketed a product designed so that it was not reasonably safe and that the defective design was a substantial factor in causing plaintiff's injury." *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 107 (1983).[3] The plaintiff bears the burden of establishing "that the product, as designed, was not reasonably safe because there was a substantial likelihood of harm and it was *feasible to design the product in a safer manner.*" *Id.* (emphasis added); *see also Tuosto v. Philip Morris USA Inc.*, 672 F. Supp. 2d 350, 364 (S.D.N.Y. 2009) (same); *Clinton v. Brown & Williamson Holdings, Inc.*, 498 F. Supp. 2d 639, 646 (S.D.N.Y. 2007) (explaining that plaintiff must put forth "proof of a feasible alternative design [as] a prerequisite to establish a prima facie design defect claim under New York law"); *Liz v. William Zinsser & Co.*, 253 A.D.2d 413, 414 (App. Div. 1998) ("Finally, the court erred in not dismissing those causes of action predicated on a design defect theory, as the plaintiffs failed to demonstrate that it was feasible to design the product in a safer manner." (citation omitted)).

Plaintiffs produced no evidence during discovery that it was feasible to design the Polyethylene Tibial Insert in a safer manner.  Professor Robert Rose did not provide evidence of a feasible, alternative design in his expert report.  When defendants asked him at his deposition to identify potentially defective portions of the Polyethylene Tibial Insert, Professor Rose testified that he was "not going to say how it ought to be redesigned" and that he was "not going to make a design recommendation" at that time.  (Sheehan Decl. Ex. D (Mar. 15, 2010 Dep. of

---

[3] In this diversity action, New York law governs all issues presented by the defendants' motion for summary judgment. *McCarthy v. Olin Corp.*, 119 F.3d 148, 153 (2d Cir. 1997) (applying New York law to products liability action against out-of-state defendants).  The parties appear to agree that New York law governs this case.

Robert Rose ("Rose Dep.")), at 89, 100.)  Instead, Professor Rose testified generally about the issues he would need to consider before he could propose an alternative design.  (Rose Dep. at 100–02 (listing "a whole bunch of complex issues" that he would need to consider before proposing an alternative design, and concluding, "I can't give you a precise fix to this.  Clearly there are a number of avenues that have to be pursued.").)

Expert discovery closed on March 26, 2010.  (Doc. No. 23.)  At that time, Professor Rose had not provided evidence of a feasible, alternative design.  Nevertheless, in connection with their opposition to defendants' motion for summary judgment, plaintiffs submitted a declaration from Professor Rose that proposes, for the first time, two alternative designs.  (Rose Decl. ¶¶ 32–34.)  Defendants move to strike this portion of the Rose Declaration pursuant to Federal Rule of Civil Procedure 37, and the Court GRANTS that motion.

a.  *Rose Declaration*

Rule 26 of the Federal Rules of Civil Procedure requires all expert witnesses to submit a written report that includes "a *complete statement* of all opinions the witness will express and the basis and reasons for them [and] the facts or data considered by the witness in forming them."  Fed. R. Civ. P. 26(a)(2)(B) (emphasis added).  Rule 37(c)(1) provides that a party who fails to provide information required by Rule 26(a) is not permitted "to use that information . . . to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  "The purpose of the rule is to prevent the practice of 'sandbagging' an opposing party with new evidence."  *DeLuca v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, No. 06-CV-5474 (JGK), 2008 U.S. Dist. LEXIS 25916, at *36 (S.D.N.Y. Mar. 29, 2008) (citing *Ebewo v. Martinez*, 309 F. Supp. 2d 600, 607 (S.D.N.Y. 2004)).  "A district court has wide discretion to impose sanctions, including severe sanctions, under" Rule 37.  *Design*

*Strategy, Inc. v. Davis*, 469 F.3d 284, 294 (2d Cir. 2006).  No showing of bad faith is required before a court may preclude evidence.  *Id.* at 296.

"Expert testimony exceeding the bounds of the expert's report is excludable pursuant to Rule 37(c)(1)."  *In re Kreta Shipping, S.A.*, 181 F.R.D. 273, 275 (S.D.N.Y. 1998); *see also Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 98-CV-8272 (RPP), 2003 U.S. Dist. LEXIS 17623, at *5 n.3 (S.D.N.Y. Oct. 2, 2003) (confining testimony from expert to opinions set forth in his expert report).  The "duty to disclose information concerning expert testimony is intended to allow opposing parties to have a reasonable opportunity [to] prepare for effective cross examination and, perhaps, arrange for expert testimony from other witnesses." *Lamarca v. United States*, 31 F. Supp. 2d 110, 122 (E.D.N.Y. 1999) (citation and internal quotation marks omitted).  Thus, "courts will not admit supplemental expert evidence following the close of discovery when it 'expound[s] a wholly new and complex approach designed to fill a significant and logical gap in the first report,' as doing so 'would eviscerate the purpose of the expert disclosure rules.'" *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 279 (S.D.N.Y. 2011) (quoting *United States v. City of N.Y.*, 637 F. Supp. 2d 77, 107 (E.D.N.Y. 2009)); *see also Silivanch v. Celebrity Cruises, Inc.*, 171 F. Supp. 2d 241, 256 (S.D.N.Y. 2001) (precluding expert testimony that was not disclosed during expert discovery).

Here, the portion of the Rose Declaration proposing feasible, alternative designs is unquestionably "designed to fill a significant and logical gap" in his expert report. *Cedar Petrochemicals*, 769 F. Supp. 2d at 279.  The showing of a feasible, alternative design is a *sine qua non* of plaintiffs' design defect claim, *Voss*, 59 N.Y.2d at 107, but plaintiffs failed to put forth evidence of a feasible, alternative design during discovery.  Their attempt to do so for the first time in opposition to summary judgment – and only after defendants raised this deficiency

in their motion – constitutes a clear violation of Rule 26.  Therefore, the Court must consider

what sanction to impose pursuant to Rule 37.  *Design Strategy*, 469 F.3d at 294.  In deciding

whether to exercise its discretion to exclude Professor Rose's testimony about alternative

designs, the Court considers (1) plaintiffs' explanation for their failure to comply with the

disclosure requirement; (2) the importance of the testimony of the precluded witness; (3) the

prejudice suffered by the opposing party as a result of having to prepare to meet the new

testimony; and (4) the possibility of a continuance.  *Patterson v. Balsamico*, 440 F.3d 104, 117

(2d Cir. 2006).

   First, plaintiffs offer no justification for their failure to comply with the expert disclosure

requirements.  Instead, they contend that the Rose Report contains "comments upon alternate

design" and that he testified at his deposition that "surface finish of the tibial tray affects

backside wear."  (Pls.' Supp. Mem. of Law in Opp'n to Defs.' Mot. to Strike (Doc. No. 56) at

13–14.)  This argument is meritless.  At most, Professor Rose identified potential design defects,

such as surface finish, in his report and at his deposition.  In addition to identifying possible

design defects, an expert witness must demonstrate that "it was feasible to design the product in

a safer manner."  *Voss*, 59 N.Y.2d at 108.  As noted above, Professor Rose plainly testified at his

deposition that, in order to come up with an alternate design, he would need a consider a number

of "complex" issues, including surface finish, and that he could not offer a "precise fix" at the

time.  (Rose Dep. at 100–02.)  Professor Rose did not, however, provide evidence of a feasible,

alternative design during discovery, as required by Rule 26; rather, plaintiffs submitted testimony

from Professor Rose regarding alternative designs for the first time in connection with their

opposition to defendants' summary judgment motion.[4]  Thus, the Court rejects plaintiffs'
arguments that the Rose Declaration does not exceed the scope of his expert report and
deposition testimony.

Plaintiffs have offered no other justification for their failure to comply with their
discovery obligations under Rule 26.  Accordingly, this factor weighs very strongly in favor of
preclusion.  *See Prendergast v. Hobart Corp.*, 04-CV-5134 (SMG), 2010 U.S. Dist. LEXIS
82077, at *13–14 (E.D.N.Y. Aug. 12, 2010) (finding in case involving negligent repair of a
dishwasher that "[p]laintiff had ample time for expert discovery in this case and has provided no
justification for her failure to disclose the opinions in [the expert's] affidavit with his expert
report or during his deposition.  The opinions set forth for the first time in [the expert's] affidavit
are therefore properly stricken on this ground alone."); *United States*, 637 F. Supp. 2d at 108
(striking expert declaration where party who submitted it "does not even attempt to argue that
new evidence should be considered, and simply pretends that the [expert's] Declaration offers no
new opinions").

Second, Professor Rose's testimony regarding alternative designs is undoubtedly
important because plaintiffs require expert testimony to make out a prima facie case in strict
products liability for design defects.  *See Guarascio v. Drake Assocs.*, 582 F. Supp. 2d 459, 463–
65 (S.D.N.Y. 2008) (granting summary judgment to defendant where plaintiff failed to provide
expert testimony showing a feasible, alternative design).  However, this Court agrees with its
sister court that the great importance of this testimony "only serves to underscore the inexcusable
quality of its delayed submission."  *Point Prods. A.G. v. Sony Music Entm't, Inc.*, 93-CV-4001

---

[4] Plaintiffs did not move to supplement Professor Rose's expert report with evidence of feasible, alternative designs
before submitting their opposition papers.  Moreover, plaintiffs did not request an opportunity to respond to
defendants' motion to strike the Rose Declaration pursuant to Rule 37.  To ensure that plaintiffs had an opportunity
to be heard,  the Court ordered them to respond to defendants' motion to strike the declarations of Professor Rose
and Dr. Montalbano on August 18, 2011.

(NRB), 2004 U.S. Dist. LEXIS 2676, at *37–38 (S.D.N.Y. Feb. 20, 2004) (criticizing "eleventh hour effort to rescue a deficient expert report that has been the basis for the course of this litigation"). The requirement under New York law that an expert provide evidence of a feasible, alternative design is well-settled. *See Guarascio*, 582 F. Supp. 2d at 463. Notwithstanding this clear requirement, Professor Rose's own deposition testimony unequivocally establishes that he could not and would not opine on the issue of alternative designs before he considered a number of complex issues. Moreover, as both parties point out, Professor Rose is an experienced expert witness who has provided expert testimony in products liability cases numerous times before. (Defs.' Mem. in Supp. of Mot. for Summ. J. at 21; Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J. (Doc. No. 37) at 20.) Indeed, in January 2009, a district court precluded Professor Rose from testifying in a products liability case because, *inter alia*, he did not adequately show that there were feasible, alternative designs at the time of manufacture. *Fuesting v. Zimmer, Inc.*, 594 F. Supp. 2d 1043, 1048 (C.D. Ill. 2009), *aff'd*, 362 F. App'x 560, 564 (7th Cir. 2010). This opinion was handed down long before the March 26, 2010 deadline to complete expert discovery in this case. In sum, the Court finds that this factor cuts in favor of plaintiffs, but only slightly.

Third, the prejudice to defendants of admitting Professor Rose's alternative design testimony would be "severe, as discovery would have to be reopened" to permit additional expert reports and depositions. *Design Strategy*, 469 F.3d at 296; *see also Rienzi & Sons, Inc. v. N. Puglisi & F. Industria Paste Alimentari S.P.A.*, No. 08-CV-2540 (DLI), 2011 U.S. Dist. LEXIS 34237, at *11 (E.D.N.Y. Mar. 30, 2011) ("prejudice to [moving party] is particularly great because discovery is closed and would have to be reopened for [moving party] to appropriately respond to the damages calculations"); *Spotnana, Inc. v. Am. Talent Agency, Inc.*, 09-CV-3698 (LAP), 2010 U.S. Dist. LEXIS 86457, at*4–5 (S.D.N.Y. Aug. 17, 2010); *see generally*

*Convolve, Inc. v. Compaq Computer Corp.*, No. 00-CV-5141 (GBD), 2007 U.S. Dist. LEXIS 9097, at *11 (S.D.N.Y. Feb. 7, 2007).

Finally, the fact that discovery is closed and this case has been pending for over four years "weighs strongly against the possibility of a continuance." *Spotnana*, 2010 U.S. Dist. LEXIS 86457, at*5; *see also Design*, 469 F.3d at 297; *Rienzi & Sons*, 2011 U.S. Dist. LEXIS 34237, at *12.

The three factors that favor precluding Professor Rose from testifying outside the scope of his expert report outweigh the importance of his testimony to plaintiffs. *See Design*, 469 F.3d at 296–97 ("Although the second *Patterson* factor favors Design because Design's evidence of lost profits was essential to proving these damages, all of the other factors weigh heavily in favor of exclusion."); *Spotnana*, 2010 U.S. Dist. LEXIS 86457, at *4–5. The appropriate sanction, however, is not to exclude the Rose Declaration in its entirety. Instead, the Court "limit[s] [Professor Rose] to the opinions expressed in the only report authorized by the Court." *Sandata Techs., Inc. v. Infocrossing, Inc.*, 05-CV-9546 (LMM), 2007 U.S. Dist. LEXIS 85176, at *25 (S.D.N.Y. Nov. 16, 2007); *Takeda Chem. Indus., Ltd. v. Mylan Labs., Inc.*, No. 04-CV-1966 (DLC), 2006 U.S. Dist. LEXIS 278, at *4–6 (S.D.N.Y. Jan. 9, 2006) (striking from expert's affidavit opinions and bases for opinions not contained in expert report); *see also Landau v. Spenuzza, Inc.*, No. 04-CV-5504 (SLT), 2009 U.S. Dist. LEXIS 27379, at *10–11 (E.D.N.Y. Mar. 30, 2009) (precluding consideration of affidavit proposing feasible alternative designs in products liability case because expert was not disclosed in discovery and granting summary judgment in favor of defendants); *Emig v. Electrolux Home Prods.*, 06-CV-4791 (KMK), 2008 U.S. Dist. LEXIS 68811, at *11 (S.D.N.Y. Sept. 10, 2008) (finding in strict products liability action that "to the extent that the Court decides that the Affidavit contains opinions and

14

methodology not contained in or inconsistent with [expert engineer's] report, those portions will

be stricken, unless the Court is satisfied that the delay is substantially justified or harmless").[5]

      With no evidence of a feasible, alternative design, however, plaintiffs are unable to make

out a prima facie case in strict products liability for design defects.  *See Guarascio*, 582 F. Supp.

2d at 463 ("New York courts uniformly rule that competent, non-conclusory expert testimony is

needed in cases involving more complex design issues." (collecting cases)); *Kass v. W. Bend*

*Co.*, No. 02-CV-3719 (NGG), 2004 U.S. Dist. LEXIS 22217, at *36 (E.D.N.Y. Nov. 4, 2004)

(granting summary judgment as to design defect claim after excluding expert because plaintiff

produced no evidence of a feasible, alternative design), *aff'd*, 158 F. App'x 352, 352–53 (2d Cir.

2005).  Accordingly, defendants' motion for summary judgment as to plaintiffs' design defect

claim is GRANTED.

      B.    <u>Manufacturing Defect</u>

      Under New York law, a "manufacturer who places a defective product on the market that

causes injury may be liable for the ensuing injuries.  A product may be defective when it

contains a manufacturing flaw."  *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 237 (1998) (internal

citation omitted).  To recover damages for a manufacturing defect, a plaintiff must establish that

the product was defective and that the defect was a substantial factor in causing the injury.

*Gomez v. Shoes for Crews, Inc.*, 04-CV-2922 (NGG), 2008 U.S. Dist. LEXIS 59883, at *6

(E.D.N.Y. Aug. 5, 2008); *Derienzo v. Trek Bicycle Corp.*, 376 F. Supp. 2d 537, 560 (S.D.N.Y.

2005).

---

[5] As noted above, another court recently excluded Professor Rose as an expert witness because, among other things, he did not show that a feasible, alternative design existed.  *See Fuesting v. Zimmer, Inc.*, 362 F. App'x 560, 564 (7th Cir. 2010) (affirming exclusion of Professor Rose's expert testimony concerning sterilization of polyethylene in a knee prosthesis because, inter alia, "Rose failed to show that better sterilization alternatives existed in 1991").

"It is well settled that a products liability cause of action may be proven by circumstantial evidence, and thus, a plaintiff need not identify a specific product defect." *Quinlan v. Stryker Corp.*, 09-CV-7284 (HB), 2010 U.S. Dist. LEXIS 83793, at *3 (S.D.N.Y. Aug. 12, 2010) (citing *Speller v. Sears, Roebuck & Co.*, 100 N.Y.2d 38, 41 (2003)); *see also Sanchez v. Stanley-Bostitch, Inc.*, 98-CV-494 (LMM), 2000 U.S. Dist. LEXIS 9676, at *4 (S.D.N.Y. July 12, 2000). "'[I]n order to proceed in the absence of evidence identifying a specific flaw, a plaintiff must prove that the product did not perform as intended and exclude all other causes for the product's failure that are not attributable to defendants.'" *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 125 (2d Cir. 2006) (quoting *Speller*, 100 N.Y.2d at 41). Thus, "[w]here a defendant raises alternative causes to avoid liability for a product's failure, a plaintiff 'raise[s] a triable question of fact by offering competent evidence which, if credited by the jury, [i]s sufficient to rebut defendant['s] alternative cause evidence.'" *Quinlan*, 2010 U.S. Dist. LEXIS 83793, at *3 (quoting *Ramos v. Howard Indus., Inc.*, 10 N.Y.3d 218, 224 (2008)); *see also Lynch v. Trek Bicycle Corp.*, No. 01-CV-3651 (DAB), 2011 U.S. Dist. LEXIS 36012, at *8–9 (S.D.N.Y. Mar. 30, 2011) (same).

Here, plaintiffs intend to prove their manufacturing defect claim with circumstantial evidence. (Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J. at 5–6.) Defendants, however, raise two alternative causes of the failure of the Polyethylene Tibial Insert: bone cement and improper alignment. (Defs.' Mem. in Supp. of Mot. for Summ. J. at 11–12 (citing Kurtz Rep.; Sheehan Decl. Ex. B (Rep. of Dr. Neil Kramer, executed Feb. 17, 2010 ("Kramer Rep.")); Sheehan Decl. Ex. C (Rep. of Dr. Jess H. Lonner, executed Mar. 3, 2010 ("Lonner Rep.")).) Defendants also raise two alternative causes of the infection that Debra Morritt developed following the replacement of the Polyethylene Tibial Insert: her rheumatoid arthritis and use of an immunosuppressant drug called Remicade. (Defs.' Mem. in Supp. of Mot. for Summ. J. at 12

(citing Kramer Rep.).)  Plaintiffs rely on the declarations of Professor Rose and Dr. Montalbano to rebut these alternative causes.  Once again, defendants argue that the Court should strike both declarations pursuant to Rule 37.

      *a.*    *Rose Declaration*

Plaintiffs cannot rely on the Rose Declaration to support their manufacturing defect claim because Professor Rose has previously opined, both in his expert report and at his deposition, that the premature failure of the Polyethylene Tibial Insert was not caused by a manufacturing defect.  First, Professor Rose's expert report stated that the cause of the failure of the Polyethylene Tibial Insert "is inherent in the design of the prosthesis and not, in my opinion, the result of defective or inadequate material."  (Rose Rep. at 9.)  At his deposition, Professor Rose reaffirmed his position, testifying that the Polyethylene Tibial Insert was improperly designed and that its failure was not "due to a manufacturing defect of any kind."  (Rose Dep. at 102; *see also* Rose Dep. at 85–86 (Q: You are not opining that there is a manufacturing defect in connection with the insert.  Is that correct?  A:  That's correct.  There's probably better ways to do it, but I don't think I could call this defective, no.).)

The Rose Declaration, however, submitted by plaintiffs for the first time in opposition to defendants' motion for summary judgment, contains testimony purporting to support plaintiffs' manufacturing defect claim by excluding alternative causes.  (Rose Decl. ¶¶ 31, 35–39; Pls.' Mem. in Opp'n to Defs.' Mot. for Summ. J. at 18; Pls.' 56.1 Cntrstmt. ¶ 11 (citing to the Rose Declaration in support of argument that "a manufacturing defect remains an attributable cause in light of plaintiffs' excluding alternative causes not attributable to defendants").)  It is well-settled that "a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony."  *Trans-Orient Marine*

*Corp. v. Star Trading and Marine, Inc.*, 925 F.2d 566, 572 (2d Cir. 1991) (citing *Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987); *Miller v. Int'l Tel. & Tel. Corp.*, 755 F.2d 20, 24 (2d Cir. 1985)); *see also Schwarz v. FedEx Kinko's Office & Print Servs.*, 08-CV-6486 (THK), 2009 U.S. Dist. LEXIS 100200, at *35 (S.D.N.Y. Oct. 27, 2009) (precluding use of expert affidavit at summary judgment in products liability case where the expert's opinion in the affidavit contradicted expert's original opinion).  Defendants argue that the Court should preclude Professor Rose from testifying in support of plaintiffs' manufacturing defect claim because he previously ruled out a manufacturing defect as a cause of the premature failure of the Polyethylene Tibial Insert.  (Defs.' Rep. in Further Supp. of Summ. J. Mot. at 6–7.)  Plaintiffs have not responded to this argument.

The Court finds that, to the extent that plaintiffs seek to use the Rose Declaration to prove their manufacturing defect claim, it would flatly contradict Professor Rose's prior sworn testimony and expert opinion, in which he unequivocally concluded that there was no manufacturing defect.  Accordingly, defendants' motion to strike the Rose Declaration with respect to plaintiff's manufacturing defect claim is GRANTED.  Consequently, the Rose Declaration does not create a triable issue of fact by rebutting defendants' alternative causes of the damage to the Polyethylene Tibial Insert.[6]

   b.   *Montalbano Declaration*

Defendants also move to strike the declaration of Dr. Montalbano because plaintiffs did not designate Dr. Montalbano as an expert or submit an expert report from him during discovery.

---

[6] Defendant also moves to exclude the testimony of Professor Rose on the grounds that his opinion does not meet the requirements of Rule 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  (Defs.' Mem. in Supp. of Mot. for Summ. J. at 20.)  Because the Court has granted summary judgment as to plaintiff's design defect claim and has precluded Professor Rose from testifying in support of plaintiffs' manufacturing defect claim, this motion is denied as moot.  *See, e.g.*, *Gaskins v. Eli Lilly & Co. (In re Zyprexa Prods. Liab. Litig.)*, 08-CV-5165 (JBW), 2010 U.S. Dist. LEXIS 109520, at *13–14 (E.D.N.Y. Oct. 12, 2010).

*See* Fed. R. Civ. P. 26(a)(2)(A) & (B), 37(c)(1).  For the reasons stated below, the Court finds that plaintiffs may rely on the declaration of Dr. Montalbano to rebut defendants' evidence that either bone cement or misalignment caused the premature failure of the Polyethylene Tibial Insert.

The vast majority of the Montalbano Declaration does not run afoul of the disclosure requirements of Rule 26.  First, "[t]here can be no serious dispute that, as a treating physician, Dr. [Montalbano] was free to testify to opinions he formed in the course of treating [Debra Morritt], without regard to the disclosure requirements of Rule 26(a)(2)." *Palmieri v. Celebrity Cruise Lines, Inc.*, 98-CV-2037 (LAP), 2000 U.S. Dist. LEXIS 3724, at *13–15 (S.D.N.Y. Mar. 24, 2000) (collecting cases).  Second, "[c]ourts in this Circuit have regularly held that treating physicians may testify as to opinions formed during their treatment, including causation, severity, disability, permanency and future impairments, without the obligation to submit an expert report." *Manganiello v. Agostini*, 07-CV-3644 (HB), 2008 U.S. Dist. LEXIS 99181, at *35 (S.D.N.Y. Dec. 9, 2008) (citing *Smolowitz v. Sherwin-Williams Co.*, 02-CV-5940 (CBA), 2008 U.S. Dist. LEXIS 91019, at *12–13 (E.D.N.Y. Nov. 10, 2008) (noting in toxic tort case involving paint product chemicals that some cases suggest "that treating physicians may render expert opinion testimony regarding causation even without submitting a detailed report" (citations omitted)), *aff'd*, 612 F.3d 149 (2d Cir. 2010)); *see also Green v. McAllister Bros., Inc.*, 02-CV-7588 (FM), 2005 U.S. Dist. LEXIS 4816, at*41 (S.D.N.Y. Mar. 24, 2005) (where treating physician was not designated as an expert and did not prepare expert report, court limited his "testimony regarding causation . . . to opinions that he actually formed during the course of treating" plaintiff); *Martinez v. Port Auth.*, 01-CV-721 (PKC), 2005 U.S. Dist. LEXIS 19141, at *46–48 (S.D.N.Y. Sept. 2, 2005).

In his declaration, Dr. Montalbano states that the premature failure of the Polyethylene Tibial Insert "after less than one year was due exclusively and singularly to its defective nature and as such is attributable [to] the defendant manufacturer, i.e. Stryker, et al." (Montalbano Decl. ¶ 50.) He also states that it "remains [his] opinion to a reasonable degree of medical certainty that had the polyethylene component not been defective, there would have been no need for subsequent surgery after the initial total knee replacement and Ms. Morritt would not have sustained any of the many complications and procedures which ensued after this initial surgery." (*Id.*) Dr. Montalbano claims that he personally examined the allegedly defective Polyethylene Tibial Insert both during the arthroscopy procedure, and again after he removed it during the replacement surgery, at which time he examined the "entire polyethylene component . . . i.e., <u>topside</u>, <u>backside</u>, <u>post</u>, and <u>sides</u>." (Montalbano Decl. ¶¶ 21, 29 (emphasis in original).) Finally, Dr. Montalbano avers that he came to these conclusions during the course of treating Debra Morritt, and statements contained in Debra Morritt's medical chart and Dr. Montalbano's clinical notes support this position. (*Id.* ¶ 44; Montalbano Decl. Ex. 2 (Medical Chart of Debra Morritt); Janis Decl. Ex. 5 (March 15, 2006 Report of Operation); Janis Decl. Ex. 6 (May 3, 2006 Report of Operation), Janis Decl. Ex. 7 (May 4, 2006 Discharge Summary).)

A fair reading of Dr. Montalbano's declaration and his contemporaneous clinical files shows that he performed a differential diagnosis during the course of treating Debra Morritt and, to a reasonable degree of medical certainty, excluded misalignment and bone cement as alternative causes for the early failure of the Polyethylene Tibial Insert.[7] Dr. Montalbano states that he personally reviewed a CAT scan of Debra Morritt's knee in March 2006 and determined that the insert was properly aligned. (Montalbano Decl. ¶ 46.) Dr. Montalbano also noted that

---

[7] Dr. Montalbano also ruled out infection and patient misuse as alternative causes of the premature failure of the Polyethylene Tibial Insert. (Montalbano Decl. ¶¶ 45, 48.) Defendants, however, do not suggest that these are alternative causes of the insert's failure.

there were no clinical signs of misalignment following implementation and that Debra Morritt had an excellent range of motion, which, according to Dr. Montalbano, "is synonymous with a well aligned and well balanced knee with properly placed components." (*Id.*) Dr. Montalbano also stated that the wear pattern he observed was symmetrical and that misalignment of the insert would cause asymmetric wear, "i.e., one area of [the] insert wear[s] excessively relative to another." (*Id.*) Dr. Montalbano also noted that the patella component was not worn, as it would have been had the prosthesis been misaligned. (*Id.*) Finally, Dr. Montalbano found that the prosthesis was properly aligned when he performed the tibial insert replacement surgery on May 3, 2006. (*Id.*)[8] Dr. Montalbano's contemporaneous clinical notes support these opinions. (Montalbano Decl. Ex. 2 (Medical Chart); Janis Decl. Ex. 5 (March 15, 2006 Report of Operation); Janis Decl. Ex. 6 (May 3, 2006 Report of Operation); Janis Decl. Ex. 7 (May 4, 2006 Discharge Summary).)

Dr. Montalbano also excluded bone cement as a cause of the early failure of the Polyethylene Tibial Insert to a reasonable degree of medical certainty. (Montalbano Decl. ¶ 47.) Dr. Montalbano stated that when he examined the Polyethylene Tibial Insert during arthroscopic surgery and after the revision surgery, he noted that it had symmetrical wear. (*Id.*) Dr. Montalbano stated that bone cement would cause asymmetric wear. (*Id.*) Dr. Montalbano also noted that he observed no loose cement during the arthroscopy procedure or when he replaced the tibial component on May 3, 2006. (*Id.*) Dr. Montalbano stated that, even though there were likely "some minuscule residual cement particles," as there typically are following a knee

---

[8] In ruling out misalignment as a cause of the failure of the Polyethylene Tibial Insert, Dr. Montalbano also discusses the report of Dr. Jess Lonner, one of defendants' expert witnesses. (Montalbano Decl. ¶ 46.) Because this is an "opinion[] based on information not learned during the course of treatment, [plaintiffs had to] comply with the rules regarding expert disclosure." *Lewis v. Triborough Bridge & Tunnel Auth.*, 97-CV-607 (PKL), 2001 U.S. Dist. LEXIS 64, at *4 (S.D.N.Y. Jan. 8, 2001) (citing *Palmieri*, 2000 U.S. Dist. LEXIS 3724, at *14). For the same reasons the Court has precluded Professor Rose from testifying about alternative designs, the appropriate sanction here is also preclusion. *See* Fed. R. Civ. P. 37(c)(1); *Design Strategy*, 469 F.3d at 297.

replacement surgery, "[t]his particle load is <u>not</u> enough to cause premature failure of the polyethylene implant." (*Id.* (emphasis in original).)  Dr. Montalbano also asserts that the fact that the patella was not worn is evidence that bone cement did not cause the wear because bone cement would have caused wear to the patella component as well as the tibial insert.  (*Id.*)  Dr. Montalbano's contemporaneous clinical notes also support these opinions.[9]  (Montalbano Decl. Ex. 2 (Medical Chart); Janis Decl. Ex. 5 (March 15, 2006 Report of Operation); Janis Decl. Ex. 6 (May 3, 2006 Report of Operation); Janis Decl. Ex. 7 (May 4, 2006 Discharge Summary).)

Plaintiffs identified Dr. Montalbano in their Initial Disclosures, and provided authorizations for Debra Morritt's medical records to defendants in February 2009.  (Decl. of Randolph Janis, executed Aug. 25, 2011 ("Janis. Supp. Decl.") (Doc. No. 51) Ex. 22.) Defendants deposed Dr. Montalbano on November 5, 2009, at which time he produced his medical chart for Debra Morritt.  (Montalbano Dep. at 65.)  Thus, defendants had ample opportunity to question Dr. Montalbano about his clinical records and the bases for his medical opinions, including whether he believed bone cement or misalignment were potential alternative causes of the alleged failure of the Polyethylene Tibial Insert.  Moreover, defendants' experts reviewed and opined upon Dr. Montalbano's medical records and diagnosis.  (*See* Kurtz Rep. at 21; Lonner Rep. at 1–3; Sheehan Decl. Ex. F (Rep. of Scott D. Nelson, executed Feb. 18, 2010 ("Nelson Rep.")), at 1–2.)  Thus, defendants' argument that they have been surprised or prejudiced by the submission of the Montalbano Declaration is unavailing.  *See Martinez*, 2005 U.S. Dist. LEXIS 19141, at*47 ("expert disclosure rules intend to allow the opposing party to

---

[9] Dr. Montalbano also excludes bone cement as a cause of the insert's failure based on his review of the report of defendants' expert pathologist.  (Montalbano Decl. ¶ 47.)  Because this is an "opinion[] based on information not learned during the course of treatment, [plaintiffs had to] comply with the rules regarding expert disclosure."  *Lewis*, 2001 U.S. Dist. LEXIS 64, at *4 (citing *Palmieri*, 2000 U.S. Dist. LEXIS 3724, at *14).  For the same reasons the Court has precluded Professor Rose from testifying about alternative designs, the appropriate sanction here is also preclusion.  *See* Fed. R. Civ. P. 37(c)(1); *Design Strategy*, 469 F.3d at 297.

take effective discovery of an expert, a concern that is irrelevant when the opposing party is aware of the treating physician's identity and is not prejudiced by his or her testimony").

Dr. Montalbano is a veteran orthopedic surgeon with experience implanting replacement knee prostheses.  (Montalbano Decl. Ex. 1. (Curriculum Vitae); Montalbano Dep. at 104 (testifying that he performs approximately 100 knee replacements a year using the Stryker Scorpio system).)  It stands to reason that, as the physician responsible for ensuring that the knee prosthesis was properly implanted and functioning correctly, Dr. Montalbano may testify about his own differential diagnosis ruling out alternative causes for the failure of that prosthesis. Moreover, Dr. Montalbano signed a sworn affidavit stating that he considered and excluded these alternative causes for the premature failure of the Polyethylene Tibial Insert in the course of treating Debra Morritt.  (Montalbano Decl. ¶ 44.)  Thus, these are opinions that Dr. Montalbano actually formed during the course of treating Debra Morritt, and plaintiffs have not violated Rule 26 by submitting the Montalbano Declaration.[10]  *See Byrne v. Gracious Living Indus., Inc.*, No. 01-CV-10153 (LAK), 2003 U.S. Dist. LEXIS 2552, at *6–8 (S.D.N.Y. Feb. 25, 2003) ("so long as the physician's opinion was acquired directly through treatment of the patient, it is not expert testimony for purposes of Rule 26").  Accordingly, defendants' motion to strike the Montalbano Declaration is DENIED to the extent described above.

In sum, viewing this evidence in the light most favorable to plaintiffs, and drawing all reasonable inferences in plaintiffs' favor, the Court finds that the Montalbano Declaration is "competent evidence, which, if credited by a jury" would be sufficient to rebut defendants'

---

[10] The Court cautions, however, that as with any treating physician, Dr. Montalbano will be permitted to testify only to those opinions he formed in the course of treating Debra Morritt.  *See, e.g.*, *Byrne v. Gracious Living Indus., Inc.*, No. 01-CV-10153 (LAK), 2003 U.S. Dist. LEXIS 2552, at *7–8 (S.D.N.Y. Feb. 25, 2003) ("Accordingly, the lack of an expert report from Dr. Felderman is not necessarily fatal to the admissibility of his testimony, although defendants are free to argue at trial, should the circumstances warrant, that Dr. Felderman's testimony is primarily that of an expert engaged specially for trial rather than as a treating physician, in which case the Court might reconsider this ruling.").

arguments that bone cement or misalignment caused the premature failure of the Polyethylene

Tibial Insert.  *Quinlan*, 2010 U.S. Dist. LEXIS 83793, at *6 (quoting *Ramos*, 10 N.Y.3d at 224);

*Lynch*, 2011 U.S. Dist. LEXIS 36012, at *8–11.[11]  Thus, plaintiffs have raised "a triable question

of fact," *Ramos*, 10 N.Y.3d at 224 (quoting *Speller*, 100 NY2d at 43), and defendants' motion for

summary judgment as to plaintiffs' manufacturing defect claim is DENIED.[12]

    C.    <u>The Cause of Debra Morritt's Post-Surgical Infection</u>

       Plaintiffs also argue that the premature failure of the Polyethylene Tibial Insert caused

her post-surgical infection, which allegedly led to additional surgeries and injuries.  The

Montalbano Declaration purports to rebut defendants' evidence supporting alternative causes of

Debra Morritt's infection.  Dr. Montalbano's opinions in his declaration, however, are not based

on information he has gathered in his role as a treating physician.  *See Smolowitz*, 2008 U.S.

Dist. LEXIS 91019, at *13 (holding that the testimony of treating physician who was not

designated as an expert and for whom no expert report was prepared "must be limited to the

opinions he has offered in his reports, and the testimony must be based on information that he

has acquired in his role as a treating physician").  For example, Dr. Montalbano's testimony

about whether Debra Morritt's use of Remicade proximately caused her infection is based on his

_____

[11] In a letter submitted without leave of the Court, with their summary judgment briefs long since filed, defendants have requested for the first time a *Daubert* hearing with respect to Dr. Montalbano's opinions.  (Letter of Ronal G. Blum, dated Aug. 29, 2011 (Doc. No. 57) at 3.)  It is true that the requirements of *Daubert* "are not diminished merely because the expert witness is a 'treating physician' rather than an expert retained solely for the purposes of litigation."  *Munafo v. Metro. Transp. Auth.*, 98-CV-4572 (ERK), 2003 U.S. Dist. LEXIS 13495, at *54 (E.D.N.Y. Jan. 22, 2003) (citing *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 270 (2d Cir. 2002) (treating physician's proposed testimony is subject to *Daubert* analysis); *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1207 (8th Cir. 2000) ("A treating physician's expert opinion on causation is subject to the same [*Daubert*] standards of reliability that govern the expert opinions of physicians hired solely for purposes of litigation." (citation omitted))).  However, the only question presently before the Court is whether to exclude Dr. Montalbano's declaration pursuant to Rule 37.  Of course, defendants are free to make a motion *in limine* challenging the reliability of Dr. Montalbano's testimony.

[12] Defendants motion to dismiss plaintiffs' negligence and breach of warranty claims are also DENIED because "the analysis of those claims is nearly identical to the analysis for strict products liability."  *Quinlan*, 2010 U.S. Dist. LEXIS 83793, at *7–8 n.1 (collecting cases).  Defendants have not addressed Craig Morritt's claim for loss of consortium, and the Court declines to grant summary judgment to defendants as to that claim.  *Id.*

review of the report and deposition of Dr. Neil Kramer, a defense expert.  (Montalbano Decl. ¶ 49.)  Because this is an "opinion[] based on information not learned during the course of treatment, [plaintiffs had to] comply with the rules regarding expert disclosure."  *Lewis*, 2001 U.S. Dist. LEXIS 64, at *4 (citing *Palmieri*, 2000 U.S. Dist. LEXIS 3724, at *14).  For the same reasons the Court has precluded Professor Rose from testifying about alternative designs, the appropriate sanction here is also preclusion.  *See* Fed. R. Civ. P. 37(c)(1); *Design Strategy*, 469 F.3d at 297.[13]

---

[13] Plaintiffs' inability to rebut this alternative cause of the infection, however, is not necessarily fatal to their manufacturing defect claim because the infection occurred after Dr. Montalbano replaced the allegedly defective Polyethylene Tibial Insert.  (Montalbano Decl. ¶ 48; Janis Decl. Ex. 18 (March 23, 2010 Dep. of Dr. Jesse Lonner ("Lonner Dep.")), at 36.)  At the very least, if the Polyethylene Tibial Insert failed prematurely due to a manufacturing defect, it arguably caused the arthroscopic and revision surgeries, as well as pain and suffering to Debra Morritt, thereby damaging plaintiffs.  Moreover, Dr. Neil Kramer, defendants' expert witness, states that Debra Morritt's arthritis and use of Remicade put her at an increased risk of infection.  (Kramer Rep. at 2–4.)  Dr. Kramer does not state that these were the sole causes of her infection.

## <u>CONCLUSION</u>

For the reasons stated above, defendants' summary judgment motion [Doc. No. 33] is GRANTED in part and DENIED in part.  Defendants' motions to strike the declarations of Dr. Montalbano and Professor Rose pursuant to Rule 37 are GRANTED in part and DENIED in part, as set forth in this Order.  Defendants' motion to exclude the testimony of Professor Rose pursuant to Rule 702 is DENIED as moot.  Lastly, Craig Morritt's motion for substitution [Doc. No. 54] is GRANTED.  The Clerk of Court is directed to amend the caption of the case by substituting "Craig Morritt, as Administrator of the Estate of Debra Morritt" for "Debra Morritt" as one of the plaintiffs in this action.

SO ORDERED.

Dated: Brooklyn, New York
      September 1, 2011

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge